We'll hear argument next in Case 24-345, F.S. Credit Opportunities Corporation v. Saba Capital Master Fund. Mr. Gvoretsky? Mr. Chief Justice, and may it please the Court, to imply a private right of action in Section 47B, Congress would have needed to speak clearly and unambiguously. It did not. Start with the text. Section 47B doesn't come near the high bar for an implied private right of action. Congress knew how to speak clearly to create a right of action, just as it did in Sections 30H and 36B. Congress could have said, an action may be brought by any party to a contract that violates the ICA. Instead, Congress chose language that specifies what remedy is available to parties already before the Court. Section 47B applies only if a contract is unenforceable, an inherently defensive concept. And Section 47B, too, focuses on courts, not who can sue. It uses the term instance, which ordinarily means a request, not a right to bring an action. Indeed, Congress rewrote Section 47B after TAMA, Statutory structure points in the same direction. It makes no sense to think that, on the one hand, Congress expressly specified narrow rights of action for particular plaintiffs in 30H and 36B, but on the other hand, Congress subtly implied a private right of action for any party to a contract to enforce any provision of the ICA in 47B. What's more, Congress vested the SEC with an array of powers to enforce the ICA from investigation and rulemaking to exemption and filing suit, which further suggests that it didn't intend private enforcement by implication under Section 47B, too. If the Court lets the Second Circuit's decision stand, the clear statement rule in Sandoval and Gonzaga will have little meaning. The Court should leave private rights of action to Congress and reject SABA and the Second Circuit's unworkable return to the NCN regime. I welcome the Court's questions. Respondent has quite a different reading of Transamerica than you do. So would you spend just a minute or two just responding to Respondent's argument as to Transamerica? Of course. So I think Transamerica TAMA is really the linchpin of their argument. Their argument, as I understand it, is that in Transamerica the Court interpreted void a certain way in the IAA, and that necessarily carries over to present-day ICA. That's incorrect on a number of levels. I agree with them that void was the key language in TAMA, but Congress moved away from that language in 1980 when it amended the ICA. The very linchpin of the Court's opinion in TAMA was that the concept of voidness necessarily has customary incidents that let you go to court, including not only to determine the voidness but also to get restitution. In the ICA in 1980, Congress eliminated void from 47B. It came up with an entirely new construct in B1 and B2. It replaced voidness with unenforceability. Unenforceability is inherently a defensive concept, not one that lets you go to court affirmatively. Then in B2, it introduced court-focused language, focusing on what courts may or may not do when they have a contract before them in a litigation where the parties are otherwise properly before the court. Whatever one may think of TAMA as to the IAA, it doesn't apply to the ICA, where Congress moved away from that language. In addition to that, a key difference between the ICA and the IAA is that the ICA contains the two expressed private rights of action in 30H and 36B, and where Congress knows how to write a cause of action explicitly by saying a claim may be brought or an action may be brought by a particular plaintiff against a particular defendant over a particular violation. That strongly supports the notion that Congress did not impliedly leave the door open in 47B2 for an even broader cause of action that would let any party to the contract go in to sue, not just over a particular provision of the ICA, but over any provision in the ICA that may be violated. Mr. Douglas. Counsel, we have said in two troths in court in Sandoval that what we're looking at is whether Congress intended to create a private right of action. You say that neither the text or structure does, but I'm not sure you're leaving out one very important part of the context, which is the statutory history, and that's what the other side relies upon. The IAA and the ICA were passed in the same bill. TAMA then held that identical statutory language in the IAA had a private right of action for rescission. So you're relying on the changes that occurred to differentiate the ICA today, correct? We're relying on the changes, but I would also note that TAMA was a holding only as to the IAA, not as to the ICA. But the language is identical. If this case had come up a year after TAMA, do you think that on the basis of Sandoval we would have ruled differently? Well, the fact that the IAA, unlike the ICA, contained no expressed private rights of action was the very first sentence of this court's analysis in TAMA. And so even pre-1980, there was that distinction that this court in this hypothetical case might have focused on. But that difference went solely to the question of damages, not to the question of an implied cost of action with respect to rescission. There is no other claim being made. The issue is narrowed to is there a right to rescission, an implied cost of action with respect to rescission, correct? That's correct, but the court hasn't distinguished under the Sandoval line of cases between the standard where damages are sought impliedly versus the standard where equitable relief is sought impliedly. Well, but Congress has, because what we have said with respect to that statute, the TAMA statute, is that there is an implied cost of action for rescission. We didn't recognize one for damages. That's true, but the distinction in TAMA didn't turn on damages versus equitable relief. It turned on the word void in Section 215 versus different language in 206. Well, in TAMA we said that the word void is the power to rescind. And that's exactly the language that Congress used in the ICA in 47B. It says that in the instance of a party that seeks or demands rescission, that it could be given in certain circumstances. So you make much of the fact that Congress did away with the word void, but it kept exactly the meaning of void. It said the insistence of a party to seek rescission. I don't think it did, Justice Sotomayor, first, because the court said in TAMA that voidness was about more than just rescission. It was also, this is at page 18 of the TAMA decision, a person with the power to avoid a contract ordinarily may resort to a court to have the contract rescinded and to obtain restitution of consideration paid. But it didn't. All it talked about was their TAMA court was only an implied cost of action for rescission, where the subsequent disputes among courts play was whether that statute also permitted damages. And Congress answered that question in the ICA. It only permits damages in a limited number of cases and not in others. And it doesn't permit it in rescission. But, Justice Sotomayor, Congress also moved away from the word void to the word unenforceable in B-1. And I think that's a critical distinction. I'm sorry, just one last point. I know that many of my colleagues don't believe in statutory history. But here we have both a House and a Senate reports accompanying the 1980 amendments to the ICA. And in both the House and the Senate reports, it says that, quote, that private rights of action for violations of the federal securities laws are a necessary adjunct to the SEC's enforcement efforts due to the SEC's small staff and overwhelming enforcement. The Senate also wrote, the committee wishes to make clear that private rights of action should be implied to and in its enforcement to the same extent that such causes of action are implied under the ICA. The House wrote, it wishes to make plain that it expects the courts to imply private rights of action under this legislation, where the plaintiff falls within the class of persons protected by the statutory provision in question. I don't know how much more decisive on congressional intent that those statements are. The ICA implies a private cause of action for rescission. And Congress says, what you did there, do here. Justice Sotomayor, I do think that I understand of all the analysis begins and ends with the text and structure. But if I may respond on the legislative history. First, the legislative history also shows that Congress considered legislation in 1980 that would have explicitly added a private right of action. And it didn't do that. So in that sense, the same inference from... But it did it with respect to damages. It didn't say anything about, it did say about rescission, that at the insistence of any party, a court could grant rescission. It seems to me that what you want us to do is to ignore the statutory context and say that's language that's limited only to parties in the litigation. But they didn't use those words. They didn't say it's limited to parties in litigation. So I think the term party is best read to mean party to litigation. When Congress wanted to refer to a party to the contract, it did that expressly in B1. But at the end of the day, it really is not of much moment what party refers to because, again, the language that Congress used in B1 is a defensive concept of unenforceability, not one that lets you go into court. And in B2, that is court-focused language. It's not the sort of unmistakable focus on an individual and creating new rights, prescribing conduct as unlawful as to that individual that this court under Sandoval and Gonzaga and that whole line of cases has looked to in order to recognize whether Congress meant to create a private right of action. The text is the ultimate touchstone. I'd like to ask you a question about your clear statement rule. I don't read Sandoval to necessarily require or to require a clear statement. I understand the question when we're looking at implied causes of action to simply be ordinary statutory interpretation. What do the text and structure require? As distinguished from Gonzaga and our spending clause line, why do you think there should be a clear statement rule here? And I know the government takes the same position. So for starters, I think Gonzaga, and this is at page 290, equates the two standards, at least that's the first prong of the spending clause cases. Gonzaga said, if Congress wishes to create new rights, it must do so in clear and unambiguous terms, no less and no more than what is required for Congress to create new rights enforceable under an implied private right of action. As to why that makes sense, I think it goes to Justice Scalia's concurrence in the Thompson case, which I think becomes much of the basis for the Sandoval opinion, where he said that creating a private right of action is such a significant legislative act that there's only a remote possibility, that's a quote, that Congress would do that implicitly. And so before this Court, as a matter of separation of powers, reads an implied private right of action into a statute, it ought to look for that kind of clear and unambiguous legislation. That would be an innovation. We haven't expressly said that in our implied cause of action cases. I think you've said it in Gonzaga. Gonzaga was a spending clause. Haven't we said it in the context of 1983 and whether it secures a right enforceable under federal law quite apart from the spending clause context?  You said it under the first prong of the spending clause. Forget it. You said whether 1983 secures a right for purposes of federal law. Right. That is the context in which you have equated the two standards, but I think the key point is that you have equated the two standards and that the separation of powers concerns are similar across the two contexts. You might finish your answer first. I think the separation of powers concerns are similar across the two contexts. In both situations, it is the role of Congress to determine whether it is conferring a right and whether that right is privately enforceable. Thank you. I had understood that the spending clause context had particular concerns that were relevant to this inquiry. While we may have said it in the context of 1983, I thought we said it as you pointed out in Gonzaga and the line of cases there in a spending clause context in which we analogized to contracts. It was very important to have clarity from Congress in the federal grants context and that is sort of the impetus of the standard there. Have we said that same sort of thing in this context outside of spending clause? I think, again, Sandoval itself really establishes the clear statement rule. That is how this court characterized Sandoval in cases like Gonzaga. When this court was relying on Sandoval and Gonzaga and applying the same standard for both contexts, the court described it as a clear statement rule, as a rule requiring Congress to be clear. Under that rule for this purpose, I'm looking at B-2 and you say it doesn't have the kind of party-centric language. I mean, yes, a court may not deny the decision, but it does say at the instance of any party. And so we do have references in the text of B-2 related to parties. Why is that not sufficient in your view? Because the way in which this is written, its primary focus is on what courts may or may not do. In that sense, it's like the Thompson case where the court said that, I think it was the Parental Kidnapping Prevention Act there, is a mandate directed to state courts. It doesn't create individual rights, even though what those courts may do may have consequences for individuals. This, too, is court-focused language. Right, but when the right here is the right to bring the action, then a court can't do what it does unless it has an action. I don't understand why it isn't implicit in a direction to a court related to a kind of legal action that the party, as it says here, any party can bring the action. It doesn't say that any party can bring the action the way it does in Section 36. It just says at the instance of any party. At the instance ordinarily means at the request of a party, but there are all sorts of things that parties might be able to request from the court once they are already before the court. I understand that your argument here was that the party can raise it defensively. Is that right? So your point is at the instance of any party in defense. That's how this would work for you? I think that is right, and that follows from unenforceability. But unenforceability is in B-1, and B-2, we are looking at the text here, and it says that the contract has been performed. So we're sort of in a different world in B-2. In B-1, the contract hasn't yet been performed, and I suppose you could have an unenforceability argument there, but aren't we already in the world in B-2 of a contract being performed? Respectfully, I read the interplay between B-1 and B-2 differently. I think the only way that you get to B-2 is through B-1. If you have a contract that has been performed, that can be either full or partial performance, and either way you need to go through B-1 and first show it can be fully performed, but perhaps a contract with a limited term, and there's some litigation afterwards about what happened during the term that has now been completed. It may be partially performed, but either way the only way to get to B-2 is by showing that B-1 is satisfied, and that's where the defense of this concept comes in. Justice Thomas? Justice Alito? Justice O'Neill? Justice Gorsuch, anything? Unfortunately, I have several questions. I think this case is extremely close, so I'll just put cards out there on that. So when you're talking about the statute alone, I get it, but when you look at trans-America and then you look at the statute, it would be very odd to think Congress has recognized for both statutes, or I get it's for the IA, a private cause of action, and then to think Congress got rid of that by explicitly referring to the rescission right that it had just recognized in trans- that the court had just recognized in trans-America, and what the statutory language did was add the unless clause to show that you don't always have a right of rescission. So what Congress seemed to do was say recognize what the court had just said about rescission, but actually slightly put slight exceptions in there with the unless clause. And what your position would do is say everything goes to state court, and as I understand it, you can respond to that. But in trans-America, in footnote 8, they address that possibility. One possibility, of course, is that Congress intended that claims under 215 would be raised under state court, but we declined to adopt such an anomalous construction without some indication that Congress, in fact, wished to remit the litigation of a federal right to the state courts. So your theory is Congress comes back in knowing that and refers specifically to rescission, but without giving any indication, does the anomalous thing silently of remitting everything to state court. Now, so that's something you need to answer. And then I'll just get the last thing out, which bothers me, which is the SEC in 2001 in the Bush administration comes in and says, actually this is an express right of action. I think six times in the SEC brief in 2001 says this is an express right of action because it refers to rescission specifically. And so you need to deal with that. And you need to deal with how does this work in state court. You want it to go to state court. Can they bring the suit for rescission in state court? And the state court then does what? And why be in state court? So that's a lot. You can deal with whatever you want to deal with there. But those are things that are on my mind. Let me deal with as much as I can. I think I can distill that to three questions. You'll tell me if I'm missing something. One is didn't Congress just carry over the concept of rescission from the old statute to the new? Two is what happens in state court? Three is what about the SG's brief in Olmstead in 2001? Does that capture it? Footnote eight would be useful too. Okay. I'll bake that into state courts. All right. So starting with the first question, didn't Congress just carry over the concept of rescission? If that is what Congress would have wanted to do, it would have been easy enough for Congress to keep the word void. Void was really the linchpin of this Court's opinion in TAMA. And whether or not the opinion in TAMA is the correct result under the Sandoval framework, what the Court thought in TAMA was that void had a particular connotation. There were particular customary incidents, I think was the phrase in TAMA, about what void means. And it was that essential term that Congress took out of 47B and not only took out that one term, it really rewrote the whole structure. It put in the term rescission. Keep going. It did put in the term rescission, which can be a consequence of unenforceability, but it came up with this whole new construct that tells you, first, all of this is only triggered when you have unenforceability, which, according to the treatises, according to Corbin, according to Williston, according to the restatement, that is an inherently defensive concept that's a contrast with what this Court thought void meant in TAMA, which was you have an affirmative right to vote. Why don't you go to the state court? How does this play out in state court? I've tried to go through this. It strikes me as very bizarre. Anomalous was the word that the Court used in Transamerica. I'll use bizarre to figure out how this would play out in state court and why. So I think it's a complicated question what happens in state court, which I don't think you need to decide here. I don't know what the answer is. You're telling us go to state court, not federal court. We should have some idea what's going to happen in state court and why. Why are we going to state court for this? So I think that if SABA tried to do in state court what it tried to do here in federal court, first, I'm not aware of any state cause of action anywhere that would actually let them go in as a matter of state law and seek rescission in this way. So I don't know that it could ever even practically speaking come up in state court. No party, no pun intended, to this litigation has pointed to any case that is on point for that. If there were such a statute, I think that it would be preempted by the comprehensive scheme that Congress enacted in 47B. Congress intended for there to be uniform nationwide rules about how to determine what happens when a contract violates the ICA. I thought you wanted it to be a federal rule of decision in a state court proceeding, even if brought defensively. No? So I think this issue can come up in state court in that limited circumstance. And it would be a federal rule of decision? It would be a federal rule of decision. Okay. Why don't you go to the SEC brief? Sorry. So on the SEC brief, I'll let Mr. Shulman address it in more detail, but I think the... Well, they refer to it as an express right of action. So first... Express remedy. That was essentially dicta in an amicus brief because the case, Olmstead did not itself even present the question of whether there was a right of action in 47B. Okay, thank you. It was not the most carefully considered statement by the government.   Well, and if I might just add... Do you know that, or are you just... Well, if I might just add, I think they have said that in the wake of Sandoval, which had come out just shortly before that Olmstead brief... Seven months before, I think, but yeah. But not just Sandoval. This Court's case is applying Sandoval in Stone Ridge and the later cases showing that this Court really meant something like a clear statement rule. Thank you. Mr. Baird? Just one follow-up question to Justice Kavanaugh. How might this play out in federal court in a diversity case? Could there be a declaratory judgment for breach of contract relying on that state law cause of action? I don't think there could be. I think for much the same reason that Congress intended this to be a uniform scheme that would preempt state law, it would also displace the ability to bring a declaratory judgment action. It could be used, and in fact is intended to be used, as a rule of decision in federal court if it comes up defensively. In a situation, let's say hypothetically, where a fund has a dispute with the advisor over the payment of fees, and a defense to that could be, well, wait a minute, actually the contract was never valid in the first place. It was unenforceable because it somehow violated the ICA. That might come up as a defense in that kind of a suit between a fund and an advisor, whether it's in federal or state court. Is that necessary to your argument? If we think that rescission isn't just a defense, then do you lose on the cause of action point? No, because even if rescission conceptually can be something other than a defense, this statute doesn't create the right to go to court for all of the reasons that we've been discussing. It doesn't say an action may be brought. It is court-focused. It doesn't have the unmistakable focus on creating individual rights that this court's cases require. Justice Jackson? So can I just get back to Justice Sotomayor's questions about the legislative history? I understand your point about Sandoval and moving away from legislative history in general, but do you agree that Sandoval said that statutory intent is determinative of this issue? I don't think the intent is determinative. I think the text that Congress enacted is determinative. Isn't that what Sandoval said, statutory intent, quote-unquote, is determinative, when it comes to figuring out whether Congress implied a cause of action? Sure, but there's a statutory intent. So the question is how is the intent reflected in the words that Congress enacted? Correct. But the goal is that we're trying to figure out what Congress intended. And so I appreciate that some people look only at the text and structure and context to figure that out. But you did in your argument here refer to TAMA and the enactment history and the extent to which you think that Congress wasn't incorporating the same kinds of ideas that we indicated in TAMA. So there's something to your argument that is about the statutory development here and not just the text, right? Well, I think if we never had TAMA, I'd be making the same argument about what 47B1 and B2 mean. The argument about TAMA is because I understand and understood from Justice Thomas' first question that that is really the linchpin of the other side. Of the other side. They start with that and they say it's carried through. And so I'm responding to that by saying no, it's not carried through because Congress changed the key language. But even without that change, I'd be making the same argument about what the language that is in 47B means on its face. Yes. And if we are trying to understand whether it was carried through, you say Congress changed the language and you say don't look at the legislative history to assess that. Is that your position? Because the legislative history refers to TAMA. It makes pretty clear, as Justice Sotomayor pointed out, that Congress wanted an implied private right of action in this situation just as we had held in TAMA the year before. So part of your argument does require us, in response to the other side, to close our eyes to that part of the context of this. So I don't think it does in light of Sandoval, not only because Sandoval says focused on text and structure, but also because Sandoval at 287 to 288 rejected reliance on what it called, I think, contemporary context. So it really is a matter of the text. But, Justice Jackson, understanding that you may wish to look at the legislative history, the other thing I'll say about the legislative history is that the House report and the Senate report that talks about implied private rights of action is talking about six different statutes that were all amended at the same time. That's not specific to 47B. The only place in which the reports do specifically discuss 47B, that doesn't mention a private right of action at all. So you're saying it doesn't even get us there when we look at it. This very general legislative history, even if you were to look at it contrary to Sandoval, doesn't bear the weight that it would need to bear here. Thank you. Thank you, Counsel. Mr. Shulman. Mr. Chief Justice, and may it please the Court, most statutes fail the stringent and demanding test to imply a private right of action under this Court's precedence. Section 47B of the Investment Company Act is no exception to that rule. Its text does not unambiguously create new rights or focus unmistakably on individual plaintiffs. Instead, it references preexisting state law rights and tells courts how to limit them after finding a violation. The ICA's structure confirms that Congress knew how to authorize private suits, as it did expressly in two narrow provisions that do not apply here, while otherwise entrusting broad enforcement authority to the Securities and Exchange Commission. In contrast to those express rights of action, Section 47B simply imposes rules of decision that apply in cases otherwise properly before a court, but it does not implicitly authorize commencement of new federal lawsuits by anyone who alleges that a contract violates any part of the ICA. The judgment of the Second Circuit should be reversed. I welcome the Court's questions. Would you zero in on Respondent's argument in use of the Transamerica case? Yes, thank you. So I agree with my friend that the Transamerica case was focused on the word void in the Investment Advisors Act. That's the key language that it relied on, the customary incidence of voidness to imply a right of action for rescission, and that's the language that Congress removed from the Investment Company Act in 1980. So that's not the text that's before this Court, and I don't think this Court needs to question Transamerica at all. This Court has a different statute in front of it, and the post-1980 ICA does not meet the standard to apply. If it were, Mr. Shulman, suppose that Congress had done nothing on the ICA front. Would Transamerica control? We think that would be a closer question, but no, ultimately I don't think it would. I think, as my friend mentioned, there are differences between the ICA even before 1980 and the Investment Advisors Act, such as the fact that there were other express rights of action in the Investment Company Act. That's something that the Transamerica Court noted about the Advisors Act. So we think that alone could provide a distinction. Although there were express rights of action for damages, and presumably Congress is considering both of these pieces of legislation at the same time, their companion bills, the fact that they decided to have damages suits in the one, I don't know. They knew how to do it. They decided to have damages suits in one, not in the other, but what does that have to say about the issue that Transamerica decided? Well, I agree with what my friend also said, that this Court's implied right of action cases have not drawn a distinction between damages and equitable relief, that it's sort of drawn, painted with a broad brush in that respect. But you would really have us take a look at these two companion pieces of legislation passed at the same time and say that the exact same language has one result in one statute and the other result in another statute just because there happens to be in one of the statutes private rights of action for damages that are essentially unrelated. That seems like a pretty extreme position, honestly. So I will say that's a hypothetical question that this Court doesn't need to decide. It obviously doesn't have to be. But it helps me think about it. You know, it helps me figure out, like, what's the baseline here? Sure. So I'll offer two things in response to that. I think there's another potential distinction between the two statutes, which is that the Investment Company Act is distinctive among the securities laws, even as distinct from the Advisers Act in how intrusively it treads on core matters of state law about the internal workings of corporations, who can be on a board. And so there I think there's special reason to think that Congress might not have been treading into areas traditionally governed by state law to the same extent. I also think that even if the logic of TAMA might suggest the same results for the pre-1980 ICA, this Court didn't confront it, and this Court, its methodology has evolved. You know, it hasn't really. This is several years after Court v. Ash. I think Mr. Clement makes this point in his brief. We hadn't gotten to the rhetorical pitch that we discovered in later cases, maybe. But the Court had made a shift already. This was by the exact same people who decided Court v. Ash. This is not an Ancien Regime case. So I think TAMA is a transitional case. There are certain respects in which it more closely resembles the modern cases. But it also is relying on some of the bad old days cases, such as the Cardon case in the District Court, the Mills case, which was really a follow-on to Borak, the epitome of the bad old days. So I think it certainly... Tandeville specifically cites Transamerica in a kind of approving way. That's true. Not kind of approving, very approving, several times. It cites the specific aspects of TAMA that more closely resemble the modern cases. The rule statement at the beginning about how an implied right of action is a question of statutory intent, and then it cites the analysis of the damages question in 206. It conspicuously does not cite the portion of the TAMA opinion that is discussing whether there's a right to rescission. I'll ask you one more, and then I'll stop. So you said void, and you're absolutely right. All the language is void, void, void. But I'm wondering whether the fact that they changed void to unenforceable has to do with what Justice Kavanaugh was talking about, that they have this unless clause in there. So they basically say, well, not always. It's really unless enforcement would be more equitable. And once you have an unless clause, you kind of have to change the word void. You know, like void, unless, blah, blah, blah. It's just not the way we think of voidness, that, like, you can be void and then discover you're not void. So they did change it. They did say not always rescission, but they changed it in a way that actually explains why they had to change the word void, and I'm not sure that you can pin too much on that. So I think that that point dovetails with and supports our argument that whatever you think Congress was doing in 1980, it was clearly pulling back from and reacting and saying that it did not want the full consequences of voidness that TAMA suggested. And so we think that's a reason to suggest that it clearly was contemplating that more of these contracts would be enforced, and, you know, certainly that, I think, dovetails with our argument that it also doesn't pass the clear statement to imply a private right of action. I think there's an important distinction, too, that the 1980 amendments also amended other provisions of the Investment Advisors Act but did not amend 215 in the Advisors Act, the key provision in TAMA, which still says void. So I think that's just a very strange way to think that Congress was ratifying the intent, the decision in TAMA as applied to the ICA. If anything, I think that it suggests that Congress was perhaps acquiescing in that result as to the Advisors Act, but saying, no, we don't want that result in 47B of the Investment Company Act. We're moving away from that. What can happen in state court now under your view? So I think all parties agree, and we do, too, that it could at least be raised defensively. The at least is important. Can it be raised more than defensively in your view? So we are agnostic on that for purposes of this case. Well, that's a pretty important thing to be agnostic on. You don't have a view on that, how it's going to play out in state court? So I agree with what Petitioners say, that the cases that have been cited in the briefs, you know, we haven't seen a case brought under a state law cause of action, even in the circuits that have not allowed it. Well, you will soon if you prevail here. I think that's a fair question, but, you know, the Third Circuit has barred a private right of action under 47B-2 since 2012, and we haven't seen cases in that circuit. Except there is a question, which is federal law trumps state law, correct?  And what you're suggesting is that Congress thought that it was the right of the state to permit bylaws that violate the ICA, unless you go to court to challenge that practice, meaning you, the government. We do think that the SEC is the primary enforcer. I agree, but what you're suggesting to Justice Kavanaugh is that Respondents are barred from going to state law for a declaratory judgment rule. They could go to state law and say, this permissible bylaw under this state's rules violates federal law. Federal law trumps. So we actually haven't taken a position on whether a declaratory... I'm pushing you the way Justice Kavanaugh did. Well, do you really think that Congress intended in this language change to permit states to let companies do what they wanted with respect to voting rights and do it until the SEC acted? So I do think that Congress intended for the state law remedies or cause of action variable to be in the first instance where parties should turn. And I think that, you know, whatever else the 1980 amendments did... State law should be where they should first turn. So they go to state law and say, declare this bylaw invalid under federal law. Can they do that or can't they? So I'll just say Respondents here are asking for rescission. I don't think that that could be provided in a declaratory judgment action. So that's all you need to decide this case. To the extent there would be a hypothetical question about a declaratory judgment action, the complaint in this case at Pet. Act 36... I don't know what else Floyd means but that. I'm sorry. Please finish. There is not complete diversity among the parties in this case, so I don't think that would be available here. In another hypothetical case, it's possible, but certainly the Declaratory Judgment Act just gives courts discretion, and we think it might not be appropriate for courts to exercise their discretion. But we think that's an issue that this Court can leave for another day. I have a question, Mr. Shulman, about how you understand the scope of... I'll ask in my round-robin time. No, no, please. How you understand the scope of the cause of action that would be implied here? You know, as I read comma, it was a pretty narrow cause of action because the Court said it was apparent that the two sections were intended to benefit the clients of investment advisors and parties to advisory contracts. Do you understand the cause of action that Respondents are seeking here to sweep far more broadly than that? I do think there's potential that it could. You know, the parties in this case have a disagreement over what party means. We don't think that's dispositive, and I understand petitioners to agree with that. But I do think there's potential that Congress could have thought this would be disruptive to allow, and that's potentially why it made that change in 1980 to the extent this Court... Because it could be any contract. Putting aside the parties' point, it's not just focused on a particular kind of contract or a narrow beneficiary of a particular statutory provision. That's exactly right. Yes, Your Honor. Thank you. I want to figure out exactly what we're talking about when we're referring to the Ancien Regime. It seems to me that can be understood in two different ways. One is, if you have a court interpreting the statute and relying in its interpretation on materials that would not necessarily be relied on today in legislative history, I understand that you don't say, well, we're going to start all over again and reinterpret that statute. But if you have the statute come before us today, the fact that there's legislative history in it and that the statute was passed back in that day, I understood the approach of cases like Gonzaga and others to be that we think that the best way of understanding that statute is to look at the text of the statute rather than what some legislators from some houses of Congress may have thought about it. So that's not... The fact that the statute comes from before Sandoval is not a license to look at what legislative history... All that means, as I understand it, is that you don't go back and reinterpret a statute you've already interpreted. Is that your understanding? Yes, absolutely. And I think Sandoval says that the court will not revert to the understanding of implied rights of action that was prevailing at the time the statute was passed. This court applies its current methodology to the cases that come before it. Thank you. Justice Thomas? Justice Aziz? Justice Sotomayor? Sorry. The SEC brief in 2001 referred to it multiple times as an express remedy. Do you disagree with that? We do. As we say in our brief, we've reconsidered that position in light of this court's developing jurisprudence. And I don't think that's the theory on which the Second Circuit ruled either. The Second Circuit said that there is not an express right to sue in 47B, and so we just think that the way this court analyzes these statutes now does not provide a right of action. You mentioned that the SEC can grant exemptions, and that would create confusion in your brief, right? We do think there's the possibility of that. I do want to say we are taking this court at its word that text and structure is what matters, so we're not making a policy argument that you should decide on that basis, but we do think there's a possibility of that. Okay. But if there's state court actions, those SEC exemptions and the certainty that would grant would be out the window anyway, whether it's state court or federal court, and you being agnostic on the state court thing means that argument really just drops out entirely then unless you want to take a position on that. So I'm not sure that that's right about exemptions. The parties don't really get into this, but I think it's at least possible that an exemption granted by the SEC is not a simple forbearance from prosecution. It's granting an exemption from the requirements of the statute that I think could apply in private action as well. So we don't think it would necessarily undermine exemptions in that way. The Yahoo litigation is an example of litigation over the scope of an exemption, but I don't think the parties were arguing there that the exemption was not a shield in private litigation. And from your perspective, the Second Circuit's had this rule for about seven-ish years, I think, six or seven. There have been problems in the Second Circuit with the rule. So there have been an increasing number of suits invoking this private right of action that we've seen. As I say, we're not primarily relying on disruption, but the amici do point to things that from their perspective are disruptive, and we think to the extent this Court is concerned. Well, how would you characterize what's – is it disruption just meaning illegality in the contracts as being the subject of the suits, or what's the disruption? Well, so I would say the disruption is that the SEC is the primary regulator in this area. It's in communication with regulated parties. It brings enforcement actions. It has informal communications with parties. And then for private parties to come in and seek to upset these contracts that the SEC is aware of from these registered investment companies, that's – you know, we don't think Congress anticipated that necessarily. Thank you. Justice Jackson? Is there any daylight between you and Mr. Dvorsky? I don't think we disagree on anything necessary to decide the case. As I was attempting to say earlier, we haven't taken a position on the argument in Petitioner's reply brief about whether there would be preemption of an affirmative state cause of action, but I don't think this Court needs to reach that to decide this case. Thank you. Thank you, Counsel. Mr. Clement? Mr. Chief Justice, and may it please the Court, having heard the argument to this point, let me emphasize three points. First, I don't really think this is an implied cause of action case at all. There's expressed text here. There's about 150 words in 47B, and the question is, what's the best reading of that statutory text? I think if you look at the actual statutory text, it becomes clear that Congress couldn't have possibly wanted to get rid of the rescission action it would have understood there to be in the shall be void language. In B-1, it adds not just the word unenforceability, which if that were it, might be different, but it says unenforceable by either party, which is very close to a synonym to void, and probably the reason that Congress used the synonym and not void is precisely the one Justice Kagan suggested, which the unless clause looks a little uneasy with the word void, but works better with unenforceability by either party. But in all events, B-2 uses rescission by any party, so it makes it expressed. That's why the SEC had this exactly right in the Bush administration that this is an expressed cause of action case. And then B-3 should not be ignored either, because it addresses two secondary questions that can arise with a right to rescission, namely severability and whether you get unjust enrichment. Now, I know better than anybody that not everybody at this court likes to look at legislative history, but if you're going to look at anything, look at what Congress said specifically about adding this particular provision, and that's on page 27 of the House report. The identical language appears at page 10 of the Senate report. So you have bicameralism without presentment. What it says these words are meant to do is that, quote, they are designed to provide clearer statutory guidance in interpreting that equitable rescission remedy. They are talking that equitable rescission remedy is their reference to Section 47. So it is crystal clear, if you're going to look at that report, that they were not trying to make the rescission remedy go poof. They were trying to refine it. And the last thing I was going to say is this is a weird case, because all three parties agree that this language does more than just create a statutory right enforceable only by the SEC. The only question is whether it weirdly or anomalously, to use the footnote 8 term, is only enforceable in state court or whether you can bring it directly in federal court. I welcome the court's questions. What would a state law action look like where you could raise it as a defense? Boy, I have no idea, but let me speculate, and that's all I'm doing is speculating. I think, for starters, we could probably just go in and say we have a common law right to bring in equitable rescission action. I can cite sort of story on equity, that just in the old equity courts, you could go in and demand they bring a deed in or a contract in, and you could seek rescission on it. So if federal law provides sort of the substantive law for the vessel of that equitable rescission action, which is what I thought the government was kind of at least not foreclosing, I mean, I think that's one way to do it. Obviously, the at least language is right. We all agree that you could at least raise it as a defense in a breach of contract action. But keep in mind, that would be a very weird thing for Congress to go all the trouble of saying that in this context we care enough about compliance with the Investment Company Act that we're going to expressly use the words rescission by any party. But the only time you can bring it is as a defense to a breach of contract action, which in this context would mean an action where the fund managers actually go to the trouble of suing their own shareholders for breach of contract. Now, as far as we can tell, that essentially never happens. And the whole point of the Investment Company Act is to protect the shareholders against fund managers who have all kinds of bad incentives, like in this case where they say, you know, if you get more than 10% of the shares and you're going to tell us that we should do things differently and get this fund to be closer to net asset value, well, guess what? Anybody over 10%, you don't get to vote anymore. I mean, it's a clear violation of 18I of the Investment Company Act, so there's no way the fund here is going to sue my clients for breach of contract. So under their theory, this language that Congress went to all this trouble to add is basically negatory. Counsel, you cited the House report and then you said this is what Congress said. Did Congress pass the House report? Of course they didn't, Your Honor, and obviously I'm a little bit loose in that language. But not everybody looks at House reports and Senate reports. If you don't look at them, just ignore it. But if you ever look at these, when you have the same language in the House report and the Senate report, and they're explaining what they're trying to accomplish by the changes to this precise provision. My friend on the other side said there's the language that we talked about that's about a page later in the House report and the Senate report that says that the Congress of 1980 liked implied causes of action more than the court in 1979 liked implied causes of action. I don't think that's the language to focus on. It's helpful to us. But the critical language is the page before where they say what we are trying to do, and the we here is the House and the Senate, not Congress, but what we are trying to do here is to provide clearer statutory guidance in interpreting an equitable rescission remedy. And why did they do that? Go ahead. We've put you in a difficult spot because you usually advocate against statutory history. But this is not an individual legislator at a hearing or on the Senate floor making a statement, correct? This is the Senate and House reports that accompany the bill. That's exactly right. All right. Now, to the extent, isn't there a difference between citing to something like that as opposed to citing to ad hominem statements by senators at a committee hearing somewhere else? Totally agree. I mean, for those that look at it, there's a hierarchy of legislative history, and House reports and Senate reports are towards the top. But I do want to be clear that I read every member of this court as being willing to look at not legislative history but statutory history and the evolution of a statute. And indeed, Justice Scalia, who didn't like legislative reports, even House reports very much, one of the things he looked at is kind of the evolution of a statute. And he found, and this is the Gwinnett County case, another case where he favorably cited Toma, if you're trying to keep track of that. And in Gwinnett County, he dealt with a situation where text of the statute didn't have an express cause of action, but Congress, in a later statute, expressly waived the state's 11th Amendment immunity. And what Justice Scalia said in that case is, Uncle, you got me. I mean, at the point that you're addressing secondary questions that presuppose the existence of a cause of action, even if there's not an express cause of action, I'm going to agree that there's a cause of action. But you've been looking at statutory context to figure that out. Can I take you back to the language? Sure. So I start from the baseline that if Congress had done nothing and we had decided TAMA, you know, we couldn't reach two different results on the same statutory language. But, in fact, Congress didn't just leave well enough alone. It changed a lot. And whether you're going to say, you know, the void is the question or... I mean, I hate to be simple-minded about this, but there is a lot of red on this page when you do a red line of the TAMA provision and then the as amended provision. And I wonder whether that just doesn't take TAMA out of the picture and say, now we just look at it in the standard way. We say, is this language enough to be rights-creating? So I think if you look at it without TAMA, there's still enough there to say that there is an action. So I want, you know... But in terms of the red line, there's a lot of red, but it's all, like, red addition. It's not struck out. Three words are struck out. Shall be void. And they're replaced with 120 words that tell you all the details about how this rescissionary action is going to proceed. And the unless clause is a qualification that wasn't there, but it's a qualification that presupposes that you can get into court for a rescission. In fact, B2 is kind of written in this backwards way, which sort of assumes that the rescission is being asked for by the plaintiff, and the court shall not deny rescission unless it makes a finding. And if you want to really get deep into the weeds of this, if you trace back the proposed language here, it goes back to a proposal that was a sort of model approach to securities law by Louis Loss, and it originally said something like B1, it said defendant, and in B2 it said something like plaintiff. And in all events, then you get to B3, and B3 answers the kind of second-order questions that Congress answered in the Title IX context when it said we're going to waive the state's sovereign immunity. It says... Justice Kagan's getting at is, all right, when Congress says we waive sovereign immunity or whatever, it's pretty uncle, uncle. Hard to get around that, right? It presupposes that there is a cause of action. But here the red line is, takes away the words shall be void and does a whole lot of other things, and that implication is not inevitable at that stage. And then it really is asking us to take one last drink. Thoughts? Thoughts. I think it is, once you get to the language that they added, 120 words they added by my rough count, they all presuppose that there is a rescission remedy available at the instance of any party. And I do think B3 are the functional equivalent of waiving sovereign immunity. You're basically answering the question of, what are we going to do about the severability of the valid provisions of the contract from the invalid provisions? And, oh, by the way, you know, B2 talks about partial performance. So there are going to be some situations where you rescind a contract that's been partly performed. And then the question is, if you got some benefit from the partial performance by the side that you're now rescinding the contract, do they owe you like $100 for mowing your lawn under quantum merit? And the answer is, yes, you get that, unjust and rich. I appreciate it. You know, there are interesting complications, some of which are befuddling. But it is not the unmistakable, there has to be a cause of action, because otherwise you don't waive sovereign immunity from it. In fact, the language that we relied on isn't here anymore. But its functional equivalent is. Okay. No, but when I learned contracts... I mean, is that our test? When I learned contracts, I was told that unenforceable by either party meant void, okay, that they were the same. That was different from a voidable contract that was only voidable by the party, like the infant or the minor or, you know, the orphan, right? You know, so I don't think Congress changed this language in any material respect, except they added the unless clause to both B-1 and B-2, and they're providing a little equitable play in the joints. But that makes no sense unless there is a rescissionary cause of action. And then you get to the rescission by any party, the instance of any party, and... That's added too, right? That's added too, and, you know, and the Latin root for that tells you that's like not just at the request, that's the initiation by any party. So, you know, I don't know if you want to go all the way back to Hale and the ecclesiastical courts, but I think any fair reading of this, whether or not you look at the House report or the Senate report that tells you exactly what they were doing, but any fair reading of this text... I'll remember that next time. Why do you think they phrased it this way, the at the instance of any party? I mean, that's your hurdle, I think. I mean, it also helps you, but the hurdle is it's phrased, you know, in the language of the court. A court may not deny rescission at the instance of any party, and so it's kind of an odd phrasing, I think you would acknowledge. Why do you think it came out that way? I think it came out that way, I mean, again... What's the theory? What's the theory? The honest answer is it was based on this Louis Loss's model security language that had something like this, and it made a little more sense the way it was originally written, because B1 was a pure defense by the defendant, and B2 was rescission by the plaintiff. And as sometimes happens, they modified the words a little bit, and maybe something gets a little clouded, but I don't think it really gets clouded. Let's say this for starters. If you were trying to say that this is only a defense that can only be raised by the defendant, the worst phrase in the world would be rescission by any party. I mean, because that makes it clear, like it's the plaintiff or the defendant. I think I agree with what you just said. How does that even play out, do you think? And then we're getting back to the state court action. And I'm glad you asked about that, because by the time my friend is done explaining how this is going to play out if you don't have a federal cause of action, by my count, she's got implied preemption kicking in, so much for textualism. But then I heard today for the first time that there's somehow going to be implied displacement of the Federal Declaratory Judgment Act in a case where there's diversity jurisdiction. I mean, the circus music is playing over here, and you avoid all of that, all of that, all of the anomalous result from footnote 8 if you just say, hey, this isn't that big a deal. And keep in mind, whatever you decide in this case, you are going to be able to go into federal court under an equivalent action under the Investment Advisors Act and the Exchange Act. It's not just TAMA, it's 29B of the Exchange Act, which has the same shall-be-void language, happens to actually Congress in 1938, two years before it passed these statutes, it added a statute of limitations to shall-be-void language, making clear beyond all capital that that was a cause of action. And I think you have the similar thing here. By the time they add B-2, by the time they add B-3, you can only understand... Do you understand their implied preemption thing? What were they talking about there? I think they were talking about the fact that once you were in state court and you raise this as a defense, it is a uniform nationwide federal defense that would displace any state law that's sort of gotten in the way of raising the state defense. But again, to me, when they're trying to get up here and bang the table about text, text, text, text, at the point they're relying on implied preemption to make things sort of work in state court, I think they've lost the theme. The theme is look at the text. I think this is an easy case after TAMA for the reasons we discussed. But I take this text straight on, and this text, I mean, rescission at the instance of any party. But, Mr. Kortman, any party, if it refers party to the contract, then it's not crazy language to use. I heard you say to Justice Kavanaugh that that would be the worst language to use if it was a defense, and I assume that you meant because you're thinking of parties to the litigation? Or did I misunderstand that? No, I think either way, it's the worst language if what you're saying is it's only a defense. Because then you would say rescission by the defendant or rescission as a defense. You wouldn't say rescission by any party. No, but what if it's party to the contract, rescission by either party who wants to get out of the contract as opposed to party to the litigation? But again, I mean, you would say rescission by the defendant or rescission by, you know, as a defense. You wouldn't say rescission by any party. Rescission by any party sort of suggests that either, you know, both principles to the contract could raise the issue. And so, like, I just don't understand. If you were saying it's only a defense, why would you say rescission by any party? Especially because, keep in mind, and I'm going to give you an old chestnut here, Ward against Sherman, a 1912 case from this court, which described rescission as an affirmative remedy. So, like, the idea... And this court said as much in Tama, without citing my chestnut, that in Tama, like, we could say you can raise voidness or rescission as a defense, but we've never thought of it as being only a defense. The customary incident of voidness includes an affirmative right to rescission. And one way to think about this, and the way I think about this, and I think it's the way the SEC was thinking about this in 2001, is Tama probably is fairly described as finding an implied right to rescission because it had to get from the word voidness to the incidents of voidness, which include rescission, which requires a little bit of implication. I think after 1980, we're out of implied cause-of-action land. We are into express textual references to rescission... There's an express cause of action in the ICA, though. What about... And that's the difference between this and the IAA in Tama, that there is an express cause of action in this statute. Remember, the party that was resisting even an implied right to rescission in Tama raised sections 30 and 36 of the ICA, and they also raised some other express causes of action and other provisions of the securities law. And they said, this shows you that when they want to do an express cause of action, they know how to do it. And that didn't deter the majority in Tama, which, of course, included Justices Rehnquist and Justice Powell, from finding the rescission remedy. And, of course, that decision... You know, there's the transition from, yes, we're finding a rescission remedy to, no, we're not finding a damages remedy. And the Court says it's quite different. So in Tama, they expressly considered the same causes of action for damages in the ICA, and it didn't stop them from inferring a rescission remedy in the IAA. And now, like, my friend will tell you, well, yeah, but this time it's the exact same statute. But that makes very little difference in the context of these two particular statutes, which were passed the same day in the same act of Congress. And, indeed, if anything, the argument that was kind of made in Tama is, look, the Investment Company Act, they wanted some remedial stuff because they had these two damages actions, so they probably would have been more forgiving of wanting rescission action. So I just don't think you can get there from that. I think Tama got it right on the rescission, but it was by implication. I think after 1980, it's no longer even by implication. And that's, I think, what the SEC was saying in 2001 when they said, and, you know, dictum, I don't know, I don't know, amicus praestus had dictum, but they said it six times. So it was a pretty considered position. And, by the way, it was all in service of getting the Second Circuit not to come up with an implied damages remedy. The SEC told the Second Circuit, you don't have to do that, because there is an express remedy for that. What's that? That's the same as Transamerica don't have the damages remedy, just have the rescission. Yes, exactly, and I will say this, I mean, you know... They were 9-0 on the rescission, 5-4 on the damages remedy. Exactly, exactly. But can I, well, keep going, sorry. Yeah, I'd just like to make this point about this, which is, like, there's a huge difference between a damages action, which is going to attract all sorts of litigation, and a rescission action, which is about the most targeted kind of relief you can get, and there just isn't a lot of money, in most cases, in rescission. Well, but this is what I was going to ask. The amicus briefs say, if we agree with some of the amicus briefs on the other side, in addition to petitioners in the SEC, I think use phrases like chaos, disruption, kind of toss those around. So I want to, you know... I'm glad you asked. So let's start with the last six years in the Second Circuit, okay? I eventually want to talk about history going back to the Exchange Act in 1935, and the investment... Let's just go to the last six years. Let's just go to the last six years. Now, I would say, in most circumstances, just six years in one circuit, not that big a deal. But in a financial case, six years in the Second Amendment... in the Second Circuit is... Six years in the Second Circuit is a long time. And I looked at those amicus briefs, and I actually tracked down what happened in the Second Circuit. And as far as I can tell, there's really, like, two sets of litigation. There's the litigation my clients are bringing, and I think we're on the side of the angels trying to liberate shareholders and increase net asset value, okay? So I'll defend those to the end. The other cases I found, there's three cases they cite that involve challenges to SPACs, okay? Here's what actually happened in those cases. Those three SPACs, like, raised a bunch of money thinking they had some great new idea, and then that idea sort of petered out, and they hung on to their money for, like, 18 months. And at that point, somebody said, geez, this looks like an unregulated investment company because they're holding on to all this money for purposes of investment. They haven't done anything with it. And so they brought that action. The SEC, I think it was in the last administration, but the SEC looked at it and said, yeah, actually, this is a problem. And then they created a new rule that says you basically have an 18 months when you have a SPAC before you need to actually take those funds and invest them. Otherwise, you've either got to give the money back or you've got to, you know, satisfy all the requirements for an investment company. And then those cases settled favorably to the plaintiffs. And that's it, as far as I could tell. That's the floodgates have opened. And I think the reason for that, and then, of course, we've had rescission actions under the Exchange Act since 1935. I don't think there's been a moment under the Exchange Act where courts didn't think there was a cause of action for rescission under the Exchange Act. In 90 years, floodgates have not opened. Now, why is that? Because there's just not the same money in rescission that there is in a damages action. And by the way, like rescission isn't even as forceful a remedy as an injunction. You know, under injunction, you can run a prison, right? Like rescission, all you can do is take this one contract and a severable provision of the contract, if you look at B-3, take this one provision of the contract and you knock it out. Now, there are circumstances like this case where doing so is incredibly important, but it's just not going to attract the plaintiff's bar or this flood of cases... Does that make it more acceptable for us to imply a cause of action? Does it matter? Do we have any more power to imply a modest cause of action as opposed to a substantial one? And if so, what standard do we use to tell the difference? So, I don't think at the end of the day... Again, this is another... I don't, but I'm asking you to exply. I'm not asking you to imply. I'm just asking you... Well, your brief says it's one thing to imply damages and it's another thing to imply rescission. It's right out of your brief. Yeah, and I think that fairly describes what the court was thinking in Tomah. But I'm just asking you, is it your position that you think it's okay to imply rescission but not damages? I don't, actually, but... I'm glad to hear it. But I do think there are circumstances where we're looking at the same text. No, I understand your argument about text. And I do think... But I will say this. I don't think it's okay, but it is less disastrous to do it. I mean, because I do think, particularly with the rescission... Less disastrous for private litigants, perhaps, but pretty disastrous for our system of government where the people are supposed to write the laws that govern them, not judges. Yeah, I get it, but... You get it? The separation of powers might be disastrous? No, I get it, I get it. But look, at the end of the day, look at their position. They have the same separation of powers problems, and now they have huge federalism problems because they admit this isn't the normal... I'm talking about implied causes of action, and it seems to me you've acknowledged that it would be bad, not okay, at least, for us to imply any cause of action. And you don't have to do it here. Because it refers to rescission, right? It does. Rescission by any party. Rescission's in the text. This is not a one last swig. This is... Look at this text. This text says rescission... So it's a federal court-state court issue as I see it. Like, this is going to happen. It's just going to happen in federal court or state court. Now, they say... They cite Thompson a lot. So you need to respond to Thompson. Obviously, that's on the kidnapping, child custody situation, state courts. Deal with Thompson. Please. So, first of all, let me... Can I start with the dissent? Justice Scalia, Thompson. Another case where he cites Tomah favorably in his... Yeah, it's a concurrence. It's a concurrence, sorry. But he cites Tomah favorably in the concurrence. Now, I wouldn't overread the majority opinion in Thompson. Thompson is a majority opinion... In Thompson, yeah. I would not overread the majority opinion in Thompson because Thompson finds no cause of action in the Parental Kidnapping Act, and it's an easy case. I mean, the majority opinion is written by Justice Marshall. Talk about sort of the anti-Scalia when it comes to being comfortable with implied causes of action, but even he doesn't find one in the Parental Kidnapping Act. Now, here's why. That statute was passed as essentially pursuant to Congress's power to implement the full faith and credit clause. And in that context, a statute that is addressed to the courts is almost certainly assuming that you've already got a judgment under some other cause of action, and the question for the courts is, should the courts give full faith and credit to that earlier action? And in that context, to try to go into court and affirmatively use this full faith and credit statute to have a cause of action, an initial cause of action, is a complete misfit. That's why it's 9-zip against that. But I think it would be a huge mistake to say that a provision directed to the courts is somehow a strike against something being an expressed cause of action because, actually, if you're thinking not about the questions under 1981, where 1981 provides the vessel and this is just a statute that affects individual rights. When you're actually talking about something that may very well be, and in my view is, an expressed cause of action, it's not at all anomalous to refer to the courts in that because the courts are the ones that are going to administer the cause of action. So it doesn't make any difference whether you say, the courts shall not deny rescission unless... Or if you have, say, a party has a right to rescission in court unless the court... Like, they're the same thing. So, you know, it is a strike, and I don't want to be misunderstood about this. Like, it is a strike against a statute in the 1981 case if it were directed to the courts and not to the private party. But when you have something like this where the question is, is 47B an expressed cause of action, then the fact that it talks about the courts is not a strike against it. It's pretty normal to say that an expressed cause of action is going to be directed to the courts. The courts are the ones that are going to apply it. And let's hope it's the federal courts. I mean, I have to say, like, at the end of the day, I think if my friends on the other side win this case but win it on the grounds that all these things have to go to state court, they're going to rue the day. I mean, from the perspective of what they care about, disrupting the SEC's enforcement actions and all of that kind of stuff, like, the one thing worse than having the occasional rescission remedy in federal court is 50 state courts going on and interpreting the Investment Company Act on a routine basis. And that's the world they envision. Or, you know, in fairness to petitioners, what they really envision is that they're going to interpret this into nothing. And so all this 120 words about rescission by any party is never going to happen because no investment company is ever going to actually go to the trouble of suing its shareholders for breach of contract. One comment more for Petitioner on rebuttal, but I'll get it out there, is that Thompson does make clear that in the context of custody determinations and full faith and credit, it's a mandate directed to state courts, which, you know, I'll just throw that out there. Yeah, no, no. And again, in the full faith and credit context, which is a very specific context where, like, yeah, you're telling the courts what their directions are about giving sort of credit to judgments that you assume have already happened in some other court. And in that context, it's custody. So, of course, it's going to be state court. But, you know, again, that argument that was made there was a 9-0 loser in an opinion written by Justice Marshall. That's not the edge case that tells you how to interpret every other statute. Mr. Kuhlman, I thought it interesting in the amicus brief for the securities law scholars that they looked at the historical context. And I don't know to what extent that matters to all of us, but it looks as though this language, even the void, and they say even the amendment, really mirrors or tries to incorporate the state blue-sky laws. And the sort of pedigree of this is that everybody really understood that a private right of action was necessary in this kind of context for a rescission in order to aid compliance with the state and federal securities laws in this way. So it was sort of like the background under which these types of provisions came into being. Do you agree with that perspective? I agree with that. I think that is a very helpful brief. I mean, not everybody's going to give it full faith and credit, but I think it's a very helpful brief. And I think the point at which it becomes most helpful is when they sort of explain the transition from the state blue-sky laws to the Exchange Act of 34 and Section 29B, because that's the first statute that used the shall be void language. And, of course, everybody kind of understood, and it was quite uncontroversial that 29B created a right to rescission. And that's just the same language that carried over into the Investment Advisors Act. Thank you, counsel. Justice Thomas? Justice Alito? Justice O'Leary? Justice Kavanaugh? Justice Jackson? Thank you, counsel. Rebuttal, Mr. Strausky? Thank you, Mr. Chief Justice. I think the colloquy here today shows that this is about the most roundabout way that one could write a cause of action. If Congress wanted to create a right to sue here, it could easily have specified who can go to court, for what, whether it's for damages or for rescission, against whom. It didn't do any of those things in this statute. And so what was Congress possibly concerned with here? One thing, we know Congress was concerned with the level of enforcement and with where it was going to happen. We know that because Congress pulled back on the rescission remedy by adding the balancing requirement and the severance requirement, and that shows that Congress was concerned about over-enforcement. Congress in this statute made the SEC the primary enforcer of the ICA. It also allowed the SEC to grant exemptions, which again shows that Congress was concerned about over-enforcement. What Congress didn't try to do in 47B2 was create a backdoor cause of action that would allow anybody into court, any party to sue over any violation of the ICA anywhere. With respect to Justice Sotomayor's question about how investors could be trapped under these impermissible bylaws, one, again, the SEC has taken positions on that issue, and depending on the presidential administration, it's gone both ways. So it's the SEC that's the primary enforcer of that. With respect to my friend's comments about closed-end funds, we're actually the ones who are the angels here. These closed-end funds are ones that provide a reliable and important long-term stream of income for retirees, and the strategy on the other side is to acquire a significant share, go in, change the investment strategy of the fund, and then cash out. That's precisely one of the things that Section 1 of the ICA says that Congress was concerned about when it passed this statute. With respect to PAMA, I do think that even under the pre-1980 version of Section 47B, this court today would look at that and reach a different result. I think PAMA, as my friend from the government said, characterized it as a transitional case. The standards up at the front of the opinion, which are what Justice Scalia latched onto, the 206 analysis, spot on. The 215 analysis, reading a lot into void, relying on Mills, which was an Ancien Regime-era case, relying on legislative history, not so much. So I don't think that the court would read the statute today in the way that PAMA did, but critically, again, Congress changed the key language that PAMA relied on. The three critical words are gone from the current version. With respect to damages versus injunctive relief, Sandoval itself involved injunctive relief, the Armstrong case later involved injunctive relief as well, and the separation of powers concerns are the same. Justice Kavanaugh, with respect to what happens in state court, just to clarify the point about preemption. Again, I don't think you need to decide this here, but I think what would be preempted is an affirmative cause of action under state law to seek rescission. The reason that would be preempted is that Congress created a federal rule of decision, and the mischief that would result, I think, is illustrated in particular by the Yahoo case in the Ninth Circuit, if you wanted to look at that. Thank you. Thank you, counsel. The case is submitted.